**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARK D. JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 4:18-CV-725 PLC** |
| | ) | |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Mark Johnson seeks review of the decision by Defendant Commissioner of Social Security Andrew Saul denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act.  For the reasons set forth below, the Court reverses and remands the Commissioner's decision.

I.      **Background and Procedural History**

In January 2015, Plaintiff, then forty-four years old, filed applications for DIB and SSI alleging he was disabled as of November 1, 2010 as a result of:  post-traumatic stress disorder (PTSD), lumbar spine impairment, severe back pain, "fractured left ankle ORIF," and impotence. (Tr. 86, 181-96)  The Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a  hearing before an administrative law judge (ALJ).  (Tr. 111-23, 124-25)

In March 2017, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified.  (Tr. 36-84)  In a decision dated August 11, 2017, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 1, 2010, through the date of this decision[.]"  (Tr. 10-22)  Plaintiff filed a request for review of the ALJ's decision with

the SSA Appeals Council, which denied review.  (Tr. 1-6)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision.

## II.     Evidence Before the ALJ

Plaintiff testified that he was forty-six years old, six feet tall, and 270 pounds.  (Tr. 43) Plaintiff lived with his eleven-year-old son, and he had an associate degree in network administration and LPN certification.  (Tr. 57)  He served in the Navy from 1989 until 1996, when he was medically discharged due to injuries to his ankle and back.  (Tr. 53, 55)  During his time in the service, Plaintiff was a hospital corpsman deployed with a Marine unit during Desert Storm. (Tr. 53)  Plaintiff stated that he had a VA disability rating of eighty percent.  (Tr. 56)

Plaintiff testified that the primary reason he could not work was his lower back pain, which he described as "a sharp pain that radiates down the left and the right side of my leg and when the moving or bending it's – you know it's increased and from where I'm sitting."  (Tr. 45)  Plaintiff explained that in 2002 he underwent "a major surgery, pulled the disc out, placed the disc in there … and then two brackets on either side … and now there's weakening above and below the brackets, degenerative changes."  (Tr. 46)  Plaintiff received epidural steroid injections every three months, which "help [for] about two to three weeks."  (Tr. 46, 58)

Plaintiff stated that his ankle pain was "the true worst thing on my body because it has the dead bone in there.  It has the necrotic bone.  The ligaments are torn.  There's a tumor in there and there's a sub conjugal cyst in there."  (Tr. 47)  Plaintiff broke his ankle in 1994, and "[f]or a while [he] had a plate and seven screws," but his doctors removed the hardware in 1995 because the "screws were backing out of the plate…."  (Tr. 60)  Plaintiff explained that his doctor "wanted to fuse [his ankle] but once they saw the tumor was in there they wanted to make sure that it wasn't

cancerous … and now they want me to see an orthopedic oncologist." (Tr. 47)  Plaintiff wore a "brace to stabilize my ankle" and "a lot of time at home I'll use the Arizona boot[.]" (Tr. 61)

Additionally, Plaintiff stated that he was unable to work because "[a] lot of times it's hard to concentrate due to me not sleeping regularly and then having the nightmares at night." (Id.) Plaintiff testified that he had difficulty "paying attention" and "days where I doze – not [sic] daydream." (Tr. 51)  He generally slept "about two to three hours and then I take my medication, go back down, put [sic] another hour and then I may get a nap during the day…." (Tr. 47)  Plaintiff usually napped for "[l]ess than an hour." (Id.)  Plaintiff testified that his medication "has slowed down some of my nightmares.  They aren't as vivid as they were….," but he continued to have nightmares every night. (Id.)  Plaintiff saw a psychiatrist once every three months for treatment of PTSD, anxiety, and depression. (Tr. 62-63)

Plaintiff testified that he smoked marijuana "[u]sually once or twice a day," because his pain medications did not control his pain and the marijuana "takes … the edge off." (Tr. 49)  He explained that, instead of continuing to prescribe Percocet and Vicodin, which "really didn't take away the pain like the marijuana did," his doctors at the VA "set up a program for the medication that I am taking to work with the marijuana." (Id.)  In addition to taking pain medications, Plaintiff wore a TENS unit "every day," which "helps a little." (Tr. 59)  Plaintiff underwent four courses of physical therapy and performed the prescribed at-home exercises, but they did not "provide much of any benefit." (Tr. 58)

On a typical day, Plaintiff would "try to make breakfast, read … watch television." (Tr. 51-52)  Plaintiff's son did the household chores, such as washing dishes, doing laundry, and cleaning the bathrooms. (Tr. 52)  Plaintiff prepared meals and cooked on the stove while sitting on a stool. (Tr. 64)  Plaintiff also played checkers and video and card games with his son. (Tr.

52) Plaintiff estimated that he used his computer fifteen to twenty minutes at a time, for a total of about one hour per day.  (Tr. 65)  Plaintiff did not drive or shop, and his friend brought him groceries.  (Tr. 44, 65)  He used a cane, prescribed by his doctor, "whenever [he] walk[ed] anywhere," and he used a walker in his home.  (Tr. 60)  He also had a raised toilet seat and shower chair.  (Tr. 60)

Plaintiff stated that he was able to lift "about ten pounds and anything much after that starts increasing the radiation down my leg and the pain from lifting."  (Tr. 52)  When Plaintiff's attorney asked whether Plaintiff could lift up to ten pounds "for up to a third of an eight hour work day for about two and a half hours a day," Plaintiff replied that "a more realistic amount of weight [he] could lift for up to a third of a work day" was "[p]robably about five pounds."  (Tr. 63)  Plaintiff estimated that he could sit for twenty minutes, stand three to five minutes, and walk "about half a block."  (Tr. 45)

A vocational expert also testified at the hearing.  (Tr. 79-84)  The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work history and the following limitations:

> This individual can lift up to ten pounds occasionally, stand, walk for about two hours and sit for up to six hours in an eight[-]hour work day with normal breaks. This individual can never climb ramps or stairs.  They can never climb ladders, ropes or scaffolds.  They can occasionally balance with a handheld assistive device as in a cane.  They can occasionally stoop and crouch but never kneel and crawl.  This individual should avoid unprotected heights and exposure to hazardous machinery.

(Tr. 81)  The vocational expert testified that such an individual could perform Plaintiff's past work as a data entry clerk and user support analyst, as well as the jobs of charge account clerk, final assembler, and document preparer.  (Id.)  When the ALJ added that the hypothetical individual would need to "alternate sitting or standing positions at 20[-]minute intervals through the day but

4

remain on task," the vocational expert stated that the jobs of data entry clerk and user support analyst "could both be performed within those restrictions." (Tr. 82)

Finally, the ALJ asked whether the hypothetical individual could perform any of Plaintiff's past work or other jobs in the national economy if he were limited to simple, routine, and repetitive tasks. (Tr. 82) The vocational expert responded that the jobs she previously identified would remain. However, if the hypothetical individual were off task more than fifteen percent of the workday or absent more than one to two days per month, he would "have difficulty maintaining competitive level employment." (Tr. 83)

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in his statement of uncontroverted facts and that the Commissioner admitted and supplemented in his response to Plaintiff's statement of uncontroverted material facts. [ECF Nos. 21, 31-1] The Court also adopts the facts contained in the Commissioner's statement of additional facts, because Plaintiff did not dispute them. [ECF No. 31-2]

### III.    Standards for Determining Disability Under the Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. 42 U.S.C. § 423 (a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011).  Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. 404.1545(a)(1)); see also 20 C.F.R. §§ 416.920(e), 416.945(a)(1).  Through step four, the burden remains with the claimant to prove that he or she is disabled.  Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    The ALJ's Decision

Applying the foregoing five-step analysis, the ALJ found that Plaintiff:  (1) had not engaged in substantial gainful activity since November 1, 2010, the alleged onset date; (2) had the severe impairments of degenerative disc disease, ankle osteoarthritis, obesity, depression, and PTSD; and (3) had the non-severe impairments of diverticulosis, gout, mild obstructive sleep apnea, and "status-post heart attack." (Tr. 12-13, 18)  At step three, the ALJ found that Plaintiff

did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13)

The ALJ found that the evidence in the record did not establish that Plaintiff's physical and mental impairments resulted in limitations that were so great as to render Plaintiff disabled.  (Tr. 16, 17)  The ALJ determined that Plaintiff's physical impairments were less debilitating than he alleged because Plaintiff "used a cane sporadically, did not follow through with recommended ankle fusion surgery, did not consistently comply with prescribed physical therapy, and had large periods of time when he went without treatment."  (Tr. 16)  In regard to Plaintiff's mental impairments, the ALJ found they were less severe than he alleged because "he infrequently attended therapy," "has not required electric convulsive therapy or inpatient psychiatric treatment," "repeatedly described his medication as effective," and "had large gaps in mental health treatment." (Tr. 17)

After reviewing Plaintiff's testimony and medical records, the ALJ determined that he had the RFC to perform sedentary work with the following limitations:

> [H]e can never limb ramps, stairs, ladders, ropes or scaffolds.  He can occasionally stoop and crouch, but never kneel and crawl.  He should avoid unprotected heights and exposure to hazardous machinery.  His work is limited to simple, routine and repetitive tasks.

(Tr. 14) Based on the vocational expert's testimony, the ALJ found that Plaintiff could not perform any past relevant work, but could perform other jobs that existed in significant numbers in the national economy, such as charge account clerk, final assembler, and document preparer.  (Tr. 21) The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 22)

## V.    Discussion

Plaintiff challenges the ALJ's assessment of his credibility and RFC.  [ECF No. 20]  More specifically, Plaintiff claims the ALJ erred in finding him able to perform a limited range of

sedentary work because: (1) the record does not contain medical evidence addressing Plaintiff's physical ability to function in the workplace that supports the RFC finding; (2) the ALJ failed to consider Plaintiff's "long-term sleep impairment or its effect on his ability to work"; and (3) the ALJ failed to consider the medical opinion of the VA's consultative, examining physician, Dr. Poepsel. Additionally, Plaintiff asserts that the ALJ mischaracterized or ignored evidence of record when assessing the credibility of his subjective complaints. The Commissioner counters that: (1) substantial evidence on the record as a whole supported the ALJ's RFC finding; and (2) when determining the RFC, the ALJ properly considered all of the evidence, including Plaintiff's subjective allegations, objective medical evidence, treatment records, examination records, and medical opinions. [ECF No. 31]

A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must

affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]"  Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

     B.  Credibility[1]

The Court first considers the ALJ's credibility assessment because the ALJ's evaluation of the credibility of Plaintiff's subjective complaints was essential to the determination of other issues, including Plaintiff's RFC.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010). Although Plaintiff does not expressly claim that the ALJ erred in assessing the credibility of his subjective complaints, he challenges several of the ALJ's statements regarding his credibility. Specifically, Plaintiff argues that the ALJ the erred in discrediting the alleged severity of his subjective complaints because substantial evidence did not support the ALJ's findings that Plaintiff:  (1) did not "follow through" with the recommended ankle fusion surgery; (2) did not seek regular medical treatment; and (3) used his cane "sporadically."   In response, the Commissioner counters that the ALJ properly articulated the factors on which he relied in evaluating the consistency of Plaintiff's subjective allegations, including inconsistencies between the objective medical evidence and his subjective statements, inconsistent treatment with long breaks in treatment, noncompliance with certain treatment recommendations, and Plaintiff's continued job search during his alleged period of disability.

---

[1] The Social Security Administration issued a new ruling that eliminates the use of the term "credibility" when evaluating a claimant's subjective statements of symptoms, clarifying that "subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017) (republished).  The factors to be considered in evaluating a claimant's statements, however, remain the same.  Id. at *13 ("Our regulations on evaluating symptoms are unchanged.").  See also 20 C.F.R. §§ 404.1529, 416.929. This new ruling applies to final decisions of the Commissioner made on or after March 28, 2016.

An ALJ must evaluate the credibility of a claimant's subjective complaints before determining his or her RFC.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007).  The Eighth Circuit requires that an ALJ consider the following factors when assessing a claimant's subjective complaints:  1) the claimant's daily activities; 2) the duration, intensity, and frequency of the pain; 3) precipitating and aggravating factors; 4) the dosage, effectiveness, and side effects of medication; 5) any functional restrictions; 6) the claimant's work history; and 7) the absence of objective medical evidence to support the claimant's complaints.  Finch v. Astrue, 547 F.3d 933 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony.  Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination."  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).  However,  while "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, [and] not the courts, … such assessments must be based upon substantial evidence."  Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004).   Additionally, where an ALJ's credibility analysis is based in part on erroneous inferences from the record, a court should reverse "if the record does not weigh so heavily against the claimant's credibility that the ALJ would have necessarily disbelieved the claimant absent the errors drawn from the record."  Chaney v. Colvin, 812 F.3d 672, 677 (8th Cir. 2016) (citing Ford v. Astrue, 518 F.3d 979, 983 (8th Cir. 2008)).

In this case, the credibility analysis was particularly central to the ALJ's physical RFC determination because Plaintiff's primary complaints were lower back and ankle pain.  Plaintiff testified that the main reason he could not work was his lower back pain, which he described as a

sharp pain radiating down his left leg.  He stated that he received a lumbar epidural steroid injection (LESI) every three months and, while they provided some relief, they were only effective for two to three weeks.  Plaintiff testified that the most painful impairment was his left ankle osteoarthritis and bone mass.  Plaintiff's prescribed medications, along with marijuana, "took the edge off" but did not eliminate the back and ankle pain.  Plaintiff affirmed that he always walked with either a cane or a walker, and he estimated that he could sit for twenty minutes, stand for five minutes, and walk half a block.

Plaintiff's treatment records from the VA reveal that, while Plaintiff regularly complained of ankle and back pain as early as July 2011, these conditions significantly worsened over time.[2] In November 2011, Plaintiff presented to the emergency room with pain and swelling in the left ankle.  (Tr. 968)  An x-ray revealed interval progression of mild-to-moderate osteoarthritis of the ankle joint.  (Tr. 558)  When he visited his primary care physician Dr. Henderson in November 2011 and January 2012, his gait was antalgic and he rated his pain as 5/10.  (Tr. 937, 2289)

In May 2012, Plaintiff presented to orthopedic surgeon Dr. Evans, who noted that the left ankle MRI showed degenerative joint disease and bone infarct, prescribed meloxicam and physical therapy, and recommended orthotics.  (Tr. 927, 922)  When Plaintiff followed up with Dr. Evans on June 20, 2012, Dr. Evans wrote that Plaintiff's condition was "unchanged" because he had

---

[2] As the Commissioner states in his brief in support of the answer, there are two relevant periods in this case:  (1) November 1, 2010 through June 30, 2012; and (2) January 14, 2015 through August 11, 2017.  [ECF No. 31 at 7]  To qualify for DIB, Plaintiff must establish that he was disabled on or about his alleged onset date, November 1, 2010, and before his date last insured, June 30, 2012.  See Moore v. Astrue, 572 F.3d 520, 522 (8th Cir. 2009); see also 42 U.S.C. §§ 416(i), 423 (defining "disability" and "period of disability" as well as setting forth insured status requirements for DIB).  To be entitled to SSI, Plaintiff must show that he was disabled while his application was pending.  See 42 U.S.C. 1382c; 20 C.F.R. §§ 416. 330, 416.3335.  Thus, the relevant period for SSI in this case is from the filing date of January 14, 2015 through August 11, 2017, the date of the ALJ's decision.

neither acquired orthotics nor started physical therapy. (Tr. 912) Plaintiff did not follow through with physical therapy at that time. (Tr. 906)

Plaintiff's medical records from early 2013 reflect that, while he continued to seek regular treatment for left ankle and back pain and poor sleep, he was able to work for two months as a cook.[3] (Tr. 342, 2229) In April 2013, Plaintiff's primary care physician continued Plaintiff's acetaminophen and prescribed tramadol. (Tr. 878)

Plaintiff did not seek treatment for his physical impairments again until February 2014. (Tr. 818) At that time, Plaintiff established care with a different primary care physician at the VA, Dr. Tucker, and reported "lots of pain in left ankle and low back." (Tr. 819) Dr. Tucker observed that Plaintiff ambulated independently but his gait was antalgic. (Tr. 820-21) Dr. Tucker noted that Plaintiff was "off narcotics" and "trial of Naprosyn didn't work well," continued Plaintiff's acetaminophen, prescribed tramadol, and referred Plaintiff to pain management. (Tr. 821) X-rays of Plaintiff's lumbar spine revealed: "posterior fusion at L5-S1. There is small spina bifida occulta, versus laminectomy defect, at S1. There is minimal scoliosis." (Tr. 437)

In March 2014, Plaintiff presented to Orville Rayburn, MSN, RN, FNP for a VA compensation and pension (C&P) examination. (Tr. 789) Plaintiff informed NP Rayburn that his chronic back pain was increasing over time. (Tr. 794) He explained that his 2002 back surgery helped his radicular pain but "within the last several months [he] is developing the same radiation of pain to the left leg." (Tr. 795) On examination of Plaintiff's thoracolumbar spine, NP Rayburn noted: decreased range of motion; pain on movement; instability of station; interference with sitting, standing and/or weight-bearing; and pain to palpation with radiation to the bilateral hips

---

[3] At the hearing, Plaintiff testified that he left that job because "I couldn't stand. You know, I tried, because I was trying to work somewhere, but I wasn't able to stay there, so I had to go." (Tr. 75)

and down the left leg to the foot; abnormal gait; positive straight-leg raise tests bilaterally; and moderate radiculopathy on the left. (Tr. 798-801) In regard to Plaintiff's ankles, NP Rayburn observed: decreased range of motion with objective evidence of painful motion, bilaterally; swelling, bilaterally; instability of station and disturbance of locomotion, left; pain on palpation, left. (Tr. 806-08) NP Rayburn also noted that Plaintiff used an ankle brace and a cane. (Tr. 811) NP Rayburn concluded: "Veteran would have problems with any type of laboring or physical activities to include standing, walking, squatting, climbing stairs, carrying." (Tr. 812)

When Plaintiff returned to Dr. Tucker's office in May 2014, he was "ambulatory per self with limping gait" and "requesting cane replacement because he broke his." (Tr. 777) Dr. Tucker noted that Plaintiff "has not seen pain management and complains bitterly of his pain." (Tr. 775) Later that month, Plaintiff began treatment at the VA's "Pain Rehab Center." (Tr. 551) Plaintiff described "constant throbbing pain to his L ankle and back" and stated that "[o]ver the last month his worst level of pain has been 10+/10, best has been 8/10 – never gets better." (Tr. 551-52) Plaintiff's gait was slow and antalgic and he used a wooden walking stick and lace-up ankle brace. (Tr. 553, 557) Nurse Practitioner (NP) Angela Brock, APN-BC ordered Plaintiff a metal cane and TENS unit. (Tr. 526)

When Plaintiff returned to pain management the next month, he reported some benefit from the TENS unit and that the new ankle brace was more supportive but his ankle continued to "roll." (Tr. 745) NP Brock discontinued Plaintiff's gabapentin and prescribed amitriptyline. (Tr. 750) In July 2017, Plaintiff reported to NP Brock little benefit from the amitriptyline and stated that marijuana helped his pain. (Tr. 737-38) At that time, he had not followed up with his primary care physician or scheduled the recommended physical therapy. (Tr. 738)

Plaintiff attended physical therapy in August and September 2014.  (Tr. 516)  The physical therapist observed that Plaintiff walked with a cane and wore a soft back brace and bilateral ankle braces.  (Tr. 690, 708, 729)  Plaintiff informed his physical therapist that the stretching, stability exercises, and TENS unit provided "some" relief.  (Tr. 692, 720, 738)  In September, Plaintiff informed NP Brock that the amitriptyline did not significantly improve his sleep quality or reduce his pain.  (Tr. 693)  Plaintiff reported that his new orthotic shoe inserts and boots "give[] him more stability" but he continued to experience "sharp shooting pains down R lateral/anterior thigh constantly and down L lateral thigh with position changes."  (Id.)  NP Brock tapered Plaintiff's amitriptyline and prescribed venlafaxine.[4]  (Tr. 695)

When Plaintiff saw Dr. Tucker in November 2014, he was walking independently and requested a new cane because his had broken.  (Tr. 666)  He reported that he was "doing okay overall, the venlafaxine "help[ed] to take the sharpness off of his shooting pain," and the physical therapy strengthening exercises were improving his ankle stability and strength.  (Id.)  However, he rated his current and "average" pain as 9/10 and explained that his back pain "is more achy and throbbing that increases to the sharper shooting pain with walking – states pain starts to increase with even 5-10 steps."  (Id.)  Later that month, NP Brock increased Plaintiff's venlafaxine, prescribed ibuprofen 600 mg PRN, and continued physical therapy.  (Tr. 668)

When Plaintiff returned to Dr. Tucker's office in December 2014, Plaintiff continued to ambulate independently, reported that he was looking for a job in information technology (IT), and rated his pain 9/10  (Tr. 660, 662)  Also that month, Plaintiff saw NP Brock and reported

---

[4] On October 25, 2014, the VA issued a decision finding that Plaintiff had a combined 80% disability due to a lumbar fusion with radiculopathy in both legs (40%, 10%, 10%), left ankle fracture (10%), and PTSD (30%).  (Tr. 213-15)  The decision concluded:  "Entitlement to individual unemployability is granted effective February 21, 2013."  (Tr. 213)

improvement with the increased dose of venlafaxine and ibuprofen.  (Tr. 652) She again increased the venlafaxine and rereferred him to physical therapy because he had been discharged for missing an appointment and failing to reschedule.  (Tr. 654)

In February 2015, Plaintiff presented to an orthopedic surgeon, who administered a left ankle corticosteroid injection, ordered Plaintiff a "custom Arizona brace," and prescribed a cane. (Tr. 490, 636-37, 490)  The following month, Plaintiff began treatment with a different primary care physician, Dr. Silverstein, and complained of pain in the left ankle and lower and middle back. (Tr. 1600)  Plaintiff rated his current pain 8/10, usual pain 8/10, least pain 7/10, and maximum pain 10/10.  (Tr. 1604)

When Plaintiff followed up with Dr. Silverstein in July 2015, he was "not doing well.  Can't sleep, gets nightmares, saw psychiatry and got prazosin."  (Tr. 1558)  Plaintiff reported that the TENS unit and ankle injection helped his pain, but rated his pain 9/10.[5]  (Id.)  The following month, Plaintiff saw Dr. Sufi, physiatrist in the VA's "Physical Medicine Rehab" department.  (Tr. 15) Plaintiff informed Dr. Sufi that his radicular pain "used to feel like knives in his legs but since being on venlafaxine, it has improved and now feels like needles in both legs."  (Tr. 1551)  Plaintiff reported that his "pain is a 9 and on rare good day may be a 7."  (Id.)  On examination, Dr. Sufi noted Plaintiff walked with a cane and had:  marked limitation in range of motion in all planes of back; pain on rotation; positive straight leg raise test on the right; motor strength of hip flexors 4/5 on the right and -3/5 on the left due to pain, quads -4/5 on the left due to pain, and hamstrings 4/5; sensation to palpation and light touch decreased in the right thigh; palpation decreased in left lateral leg and left lateral foot; and light touch decreased in left lateral foot and L5 distribution.  (Tr. 1551-

---

[5] Despite Plaintiff's complaints, Dr. Silverstein noted no symptoms in the review of systems or physical exam (e.g., "No joint pain, No back pain," "No anxiety,  No depression," "stable gait"). (Tr. 1559)

52) Dr. Sufi ordered a CT scan of Plaintiff's lumbar spine and occupational and aquatic therapy, which Plaintiff began later that month.  (Tr. 1552, 1517, 1519)

In August 2015, Plaintiff requested a "tub transfer bench" because he had difficulty "stepping into the tub and standing for prolong[ed] periods of time due to back pain," and in September 2015, he requested a walker because he was "having difficulty due to pain in his ankles." (Tr. 1475, 1541) An October 2015 CT of the lumbar spine revealed:  "Postsurgical fusion of L5/S1.  Moderate degenerative changes at L4/5 and L5/S1 with facet joint arthrosis contributing to bilateral neuroforaminal narrowing at L5/S1, and more so on the left at L4/5."  (Tr. 1437)

When Plaintiff returned to Dr. Silverstein's office in November 2015, Dr. Silverstein noted that Plaintiff walked five to ten minutes per day for exercise but "stops due to left ankle and low back.  Poor sleep.  Weakness due to statin, hard to get out of bed.  Also tinnitus."  (Tr. 1527) Although he noted no symptoms in the review of systems and physical examination, he assessed: "Chronic low back pain – continue tx, left ankle pain – see ortho, PTSD  - see psych HLD-lab, tinnitus – see audio."  (Tr. 1527, 1529)  Later that month, the VA issued Plaintiff a seated, wheeled walker and replaced his metal cane because "cane grip has worn off and it slips in his hand."  (Tr. 1460)

At Plaintiff's psychiatry appointment in January 2016, he rated his pain 9/10 and was "[m]oving very slow using single prong cane."  (Tr. 1499)  The  next day, Plaintiff returned to orthopedic surgeon Dr. Evans, who noted that Plaintiff "has developed more and more pain as time progresses."  (Tr. 1465)  Dr. Evans administered a corticosteroid injection to Plaintiff's left ankle and opined that Plaintiff "may require fusion of the ankle."  (Tr. 1466)  X-rays showed: "Subchondral cystic changes at the distal tibia and no interval change.  Mild arthritic change."  (Tr. 1620)  When Plaintiff followed up with Dr. Evans in March 2016, he reported that the ankle

injection "help[ed] for [a] short period." (Tr. 1909)  Dr. Evans noted that Plaintiff was having

"more and more difficulty with this ankle and difficulty ambulating" and "wishes to have the ankle

fused." (Tr. 1909)  Dr. Evans wrote that Plaintiff "is to be scheduled for fusion of this left ankle

with possible bone graft," and he ordered a CT scan "to better evaluate [Plaintiff's] bone stock and

articular surface." (Id.)  The CT scan revealed:  "Arthritic and posttraumatic changes … as well

as a sclerotic rimmed lesion of uncertain significance most consistent with a bone infarct." (Tr.

1618, 1909)

Plaintiff returned to Dr. Silverstein's office in May 2016 with complaints of left ankle pain

and lower back pain that "radiates to left leg posteriorly, to ankle, numbness, tingling." (Tr. 1905)

Again, Dr. Silverstein's review of symptoms and physical examination were unremarkable, but he

referred Plaintiff to pain management for a lumbar epidural steroid injection (LESI), noted that

Plaintiff's left ankle "needs fusion," and provided Plaintiff an "opioid agreement." (Tr. 1908)

Plaintiff presented to pain management the next month and reported that, despite taking

"hydrocodone 4 pills/day" and doing his at-home exercises, he experienced "constant shooting

pain" that radiated down his left leg. (Tr. 1898)  Anesthesiologist Dr. Ramaswany performed a

physical examination and noted:  antalgic gait; ambulated with a cane; unable to heel or toe walk;

loss of normal lordosis of the lumbar spine; limited range of motion in all planes; diminished

sensation to pinprick over lateral aspect of the left leg; positive straight leg raise on the left; and

motor strength on the left hip, knee, and ankle was 4/5. (Tr. 1899-1900)  Dr. Ramaswany advised

Plaintiff to continue physical therapy and lose weight, and she administered an LESI the following

month. (Tr. 1885, 1990)

In July 2016, Plaintiff presented to Dr. Silverstein for a "walk-in visit" because "2 days

ago left ankle rolled, hurt left knee, since then pain, swelling, popped." (Tr. 1882)  Dr. Silverstein

prescribed ice, rest, and a topical NSAID and, in September 2016, the VA fitted Plaintiff for a knee sleeve.  (Tr. 1873, 1883)

In October 2016, Dr. Poepsel performed a C&P evaluation based on an in-person examination and Plaintiff's medical records.  (Tr. 2439)  Dr. Poepsel found that Plaintiff regularly used a cane and the traumatic arthritis of Plaintiff's left ankle caused pain, weakness, fatigability, swelling, instability, disturbance of locomotion, and interference with standing.  (Tr. 2442, 2444) On examination, Dr. Poepsel observed decreased sensation to the lower leg/ankle and right foot/toes; positive straight leg raise test on the right with signs of radiculopathy; moderate paresthesias and/or dysesthesias and numbness in the right lower extremity; and involvement of bilateral nerve roots in the lumbar spine with evidence of moderate radiculopathy on the right side and severe radiculopathy on the left side.  (Tr. 2457-58)  Dr. Poepsel opined that, as a result of Plaintiff's ankle and back impairments, "prolonged [weight] bearing, ambulation, activities requiring flexion-extension/straining to L/S spine would prove problematic."[6]  (Tr. 2450, 2463)

In November 2016, Plaintiff reported "good relief" from the previous LESI and underwent another injection.  (Tr. 2424-25)  A couple days later, he called Dr. Evans' office and a nurse informed him that Dr. Evans had retired and offered to refer him to an orthopedic surgeon outside of the VA.[7]  (Tr. 2595)

In January 2017, Plaintiff presented to orthopedic surgeon Dr. Nadaud and described "throbbing type pain localizing to the ankle" and "some pain in the foot as well."  (Tr. 2600)  On

---

[6] At a psychiatric C&P evaluation the same month, Plaintiff reported that his pain prevented him from sleeping more than an hour at a time, and he averaged two to four hours of sleep per day with intermittent sleep and napping.  (Tr. 2467)

[7] Later that month, Plaintiff suffered a heart attack.  (Tr. 2420, 2423)  In December 2016, Plaintiff followed up twice with a nurse practitioner for "hypertensive crisis, flash pulmonary edema, and a NSTEMI."  (Tr. 2420, 2481)

examination of Plaintiff's left ankle, Dr. Nadaud noted sensation intact, strength 5/5, and "significant pain to palpation anterior and medially in the ankle." (Id.) He diagnosed "arthritis in the left ankle with possible malignancy" and ordered an MRI. (Tr. 2601) The MRI, performed in February 2017, revealed: "Severe osteoarthritic changes at the ankle mortise joint with a prominent subchondral cyst and an adjacent osteochondral defect of the tibial plafond….There is a joint effusion as well. Bone infarct in the distal tibial metaphysis." (Tr. 2603) In March 2017, Plaintiff received another LESI from his pain specialist, and Dr. Nadaud confirmed severe ankle arthritis and continued work-up for bone mass. (Tr. 2582, 2604)

In his decision, the ALJ briefly summarized five years of treatment records relating to Plaintiff's physical impairments and determined that the objective evidence did not support Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms. (Tr. 15-16) The ALJ explained:

> Regarding the claimant's severe physical impairments overall, the claimant used a cane sporadically, did not follow through with recommended ankle fusion surgery, did not consistently comply with the prescribed physical therapy, and had large periods of time when he went without treatment. These factors are inconsistent with the claimant's allegations. It is reasonable to expect an individual with symptoms as debilitating as the claimant alleges to follow a treating physician's recommendations.

(Tr. 16) The ALJ concluded that "the evidence does not indicate that the claimant's severe physical impairments result in greater limitations than those included in the" RFC finding. (Id.)

To the extent the ALJ relied on objective medical evidence to discredit Plaintiff's subjective complaints, such reliance was not supported by substantial evidence when reviewed on the record as a whole. Indeed, Plaintiff's October 2015 CT of the lumbar spine revealed "[m]oderate degenerative changes at L4/5 and L5/S1 with facet joint arthrosis contributing to bilateral neuroforaminal narrowing at L5/S1, and more so on the left at L4/5." A February 2017

MRI of Plaintiff's left ankle showed "[s]evere osteoarthritic changes at the ankle mortise joint with a prominent subchondral cyst and an adjacent osteochondral defect of the tibial plafond" as well as "joint effusion."  In regard to objective clinical findings, Plaintiff's treatment providers and C&P evaluators regularly observed:  abnormal gait; inability to tandem walk; reduced range of motion of the thoracolumbar spine; decreased sensation in the left L5-S1 dermatome; positive straight leg raise tests; reduced motor strength of the left lower extremity; and decreased range of motion of bilateral ankles, left worse than right.  The medical imaging and clinical findings were not inconsistent with the alleged intensity, persistence, and limiting effects of Plaintiff's symptoms.

Plaintiff argues that the ALJ erred in discrediting the subjective allegations of debilitating ankle pain on the ground that he did not "follow through" with the recommended ankle fusion surgery.  According to the ALJ, "[o]n March 29, 2016, the plan was for the claimant to schedule a fusion surgery" and Plaintiff failed to do so.  (Tr. 16)

An ALJ may consider failure to continue treatment in determining whether a claimant may receive benefits.  20 C.F.R. §§ 404.1530, 416.930 (individual who fails to follow prescribed treatment without a good reason will not be found disabled).  Social Security Ruling 82-59 instructs that "a full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable." SSR 82-59, 1982 WL 31384, at *4.  More specifically, SSR 82-59 provides that a claimant's failure to follow prescribed treatment precludes a finding of disability where, among other things:  (1) the treatment was expected to restore the claimant's ability to work; (2) the treatment was "prescribed by a treating source"; and (3) the failure or refusal to follow the prescribed treatment was not "justifiable."  Id.  See also 20 C.F.R.

20

§§ 404.1530 416.930 (providing examples of "good reasons" for failing to follow prescribed treatment).

While the medical records demonstrate that Dr. Evans recommended surgery in March 2016 and Plaintiff contacted Dr. Evans' office in November 2016, the records do not establish the reason for the eight-month delay.  Dr. Evans' March 2016 treatment notes stated:  "CAT scan of left ankle was ordered to better evaluate his bone stock and articular surface and the patient is to be scheduled for fusion of this left ankle with possible bone graft."  (Tr. 1909)  The following week, Plaintiff underwent the CT scan which revealed the "sclerotic rimmed lesion of uncertain significance most consistent with a bone infarct."  (Tr. 1618)

It is not clear that Dr. Evans "prescribed," rather than suggested, the fusion surgery at the March 2016 appointment.  Furthermore, nothing in the record reflects either that Plaintiff was instructed to schedule the fusion surgery or that Dr. Evans would have proceeded with the fusion surgery after reviewing the results of the CT scan.  While the ALJ questioned Plaintiff about his ankle impairment, possible surgery, and upcoming appointment with an orthopedic oncologist, he did not ask Plaintiff why he did not follow up with Dr. Evans' office between March and November 2016.  As a result, the ALJ's finding that Plaintiff failed to follow through with the recommended fusion surgery was based on speculation and not substantial evidence.  See, e.g., Derfler v. Colvin, 4:13-CV-1469 NAB, 2014 WL 3858255, at *7 (E.D. Mo. Aug 6, 2014) ("Because the ALJ placed substantial weight on the failure to attend the consultative examination, the ALJ should have asked [the plaintiff] on the record the reasons for her failure to attend rather than speculating."); Jones v. Astrue, No. 4:10-CV-3 DDN, 2011 WL 4445825, at *15 (E.D. Mo.  Sept. 26, 2011) ("speculation is not substantial evidence"); Brenner v. Astrue, No. 4:07-CV-1632 DDN, 2008 WL 3925166, at *7 (E.D. Mo. Aug. 20, 2008) (same).

Plaintiff also asserts that the ALJ erred in discounting his subjective complaints of pain because "he had long periods of time when he went without treatment."  (Tr. 16)  Plaintiff states: "Aside from the ten-(10) month period from April 25, 2013 through February 27, 2014, Plaintiff sought regular and consistent treatment for five (5) years."  [ECF No. 20 at 10]

An ALJ may properly consider the frequency of a claimant's treatment when assessing the credibility of his or her subjective complaints.  Kamann v. Colvin, 721 F.3d 945, 950-51 (8th Cir. 2012) (ALJ properly considered that the claimant was seen "relatively infrequently for his impairments despite his allegations of disabling symptoms"); Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007) (noting that the claimant sought treatment "far less frequently than one would expect based on the [symptoms] that [he] alleged").  In this case, however, a review of Plaintiff's voluminous medical records reveals that his medical treatment became more frequent and consistent over time.

The Commissioner correctly points out that, although Plaintiff's alleged onset date was in November 2010, the first records of his back and ankle pain were dated July and November  2011. Prior to Plaintiff's date last insured of June 30, 2012, Plaintiff sought treatment for  back and ankle pain at three appointments with his primary care physician and ankle pain at two appointments with an orthopedic surgeon.  Plaintiff sought no further medical treatment in 2012 and was discharged from physical therapy in December because he failed to return after the initial visit.  In 2013, Plaintiff saw his primary care physician for treatment of left ankle and back pain in January and April.

Plaintiff's medical records demonstrate that his degenerative conditions worsened and his reported pain levels increased after January 2014.  In February 2014, Plaintiff sought treatment for ankle and back pain from his primary care physician, who referred him to pain management.  In

2014, Plaintiff had six sessions with a physical therapist and saw his:  primary care physician in February, May, September, and December; and pain management specialist in February, May, June, July, September, November (twice), and December.

In 2015, Plaintiff's medical appointments were somewhat less frequent and he did not return to pain management.  However, Plaintiff regularly called his providers for refills of his medications and sought treatment from an orthopedic surgeon in February, physiatrist in August, and his primary care physician in March, July, and November.  Dr. Silverstein prescribed Plaintiff a cane in February, and the VA issued him a tub bench in August and a new cane and a walker in November.  Plaintiff completed five occupational and/or aquatic therapy sessions in November and December.

The following year, Plaintiff presented to his orthopedic surgeon in January and March 2016 and began discussing surgical interventions for his left ankle impairment.  In May, Plaintiff's primary care physician referred him to pain management and prescribed hydrocodone.  Plaintiff resumed treatment with a pain specialist and underwent LESIs to treat his post-laminectomy syndrome with radiculopathy in June, July, and November.  In November 2016, Plaintiff followed up with his orthopedic surgeon and learned that he had retired.  He presented to Dr. Nadaud in January and February 2017, and underwent another LESI in March 2017.

Based on the records, the ALJ's conclusion that there were gaps in Plaintiff's treatment was not entirely baseless.  Plaintiff waited almost one year after his alleged onset date to seek treatment for left ankle pain and, as he acknowledges in his brief, he did not receive treatment for his physical impairments for a ten-month period between April 2013 and February 2014.  The Court agrees that these gaps in treatment undermine Plaintiff's claims of debilitating pain between the alleged onset date of November 2010 and date late insured of June 2012.  However, given that

the relevant period of time for Plaintiff's SSI application began in January 2015, the early gaps in treatment do not affect the credibility of Plaintiff's later subjective allegations.  The record establishes no significant gaps in treatment after February 2014.

Finally, Plaintiff contends that the ALJ erred in discounting his allegations of pain and limitation because he only used a cane "sporadically."  The Court agrees with Plaintiff's assertion that several of the medical records that the ALJ cited in support of this finding were problematic. For example, some of the treatment records contained conflicting notations that Plaintiff had a stable gait or ambulated unassisted *and* ambulated with a cane.  The ALJ also pointed to treatment notes from December 2014 when Plaintiff had broken his cane and was awaiting a new one. Finally, the ALJ cited two examinations by C&P examiner Dr. Smith, whose opinions the ALJ properly discounted because Dr. Smith improbably found that none of Plaintiff's conditions impacted his ability to perform any type of occupational task.[8]

Contrary to the ALJ's finding that Plaintiff used his cane "sporadically," the medical records establish that, with the exception of a February 2017 psychiatry appointment at which

---

[8] The Court notes that, in citing Dr. Smith's March 2015 evaluation as evidence of Plaintiff's ability to walk unassisted, the ALJ mistakenly referred to Dr. Smith as Plaintiff's "treatment provider."  (Tr. 16)  Dr. Smith performed C&P evaluations for Plaintiff in October 2014 and March 2015.  (Tr. 673-89, 1578-1600)  Following the October 2014 exam, Plaintiff contacted Dr. Tucker's office and complained about the thoroughness of the examination and inaccuracies in Dr. Smith's report.  Plaintiff wrote:  "Why was my c&p on Oct 10th only 10 minutes and it was a 2 hour slot allotted he didn't ask any questions he never even looked at my back at all I had a back brace and my tens unit on, my ankle braces on and my cane as usual but it[']s not noted in the report."  (Tr.671)  A few days later, Plaintiff followed up, stating:

> ….the lumbar portion of the CPRS that Dr. S Smith filled out is gross negligence on his behalf e.g. 18 a or b asked about scars he said none, that's because he never looked I had my tens unit on and my soft back brace.  My scar is a foot long and 2 inches wide.  Or my assistive equipment I had on both ankle braces and my cane also not noted he never did any straight leg raises nor use a paperclip on my legs….

(Tr. 669)

24

Plaintiff walked independently, Plaintiff consistently walked with a cane or a walker after February 2015, when Dr. Evans prescribed his cane.  In fact, in November 2015, Plaintiff required a new cane because the grip on his cane had "worn off."  An ALJ cannot merely "pick and choose only evidence in the record buttressing his conclusion." Taylor o/b/o McKinnies v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004).  Substantial evidence in the record demonstrates that Plaintiff regularly ambulated with either a cane or a walker.

Based on the above, the Court finds that many aspects of the credibility analysis do not appear to be supported by the record.  Furthermore, the evidence as a whole does not weigh so heavily against Plaintiff's subjective complaints that the ALJ would necessarily have disbelieved Plaintiff absent the ALJ's erroneous inferences from the record.  See Ford, 518 F.3d at 982–83 (remanding for further consideration where the ALJ gave some good reasons for discounting the plaintiff's credibility but also gave reasons not supported by the record, relied on inconsistencies that were not actually inconsistencies, and relied on the plaintiff's account of limited daily activities that were not actually inconsistent with her complaints of pain); Brosnahan v. Barnhart, 336 F.3d 671, 677–78 (8th Cir. 2003) (remanding where the ALJ gave several reasons for discounting the plaintiff's credibility that were not supported by the record).  Because the Court finds reversible error in the Commissioner's assessment of the credibility of Plaintiff's subjective complaints, the Court reverses and remands the case to the Commissioner for further proceedings.[9]

## VI.    Conclusion

For the reasons set forth above, the Court finds that the ALJ's assessment of the credibility of Plaintiff's subjective complaints is not supported by substantial evidence. Accordingly,

---

[9] Because the credibility analysis will likely affect the ALJ's RFC finding, the Court need not address Plaintiff's other specific arguments related to the RFC.

      **IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

      An order of remand shall accompany this memorandum and order.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of May, 2020